IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

MATTHEW A. KOLESAR,

                  Plaintiff,

      v.

MODASUITE (US), INC.,

                  Defendant.

Civil Action No.   1:19-cv-70

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Matthew A. Kolesar, by and through undersigned counsel, seeks a permanent injunction requiring a change in Modasuite (US), Inc.'s ("Defendant" or "Frank And Oak") corporate policies to cause its online stores to become, and remain, accessible to individuals with visual disabilities. In support thereof, Plaintiff respectfully asserts as follows:

## INTRODUCTION

1.      In a September 25, 2018 letter to U.S. House of Representative Ted Budd, U.S. Department of Justice Assistant Attorney General Stephen E. Boyd confirmed that public accommodations must make the websites they own, operate, or control equally accessible to individuals with disabilities. Assistant Attorney General Boyd's letter provides:

> The Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago. This interpretation is consistent with the ADA's title III requirement that the goods, services, privileges, or activities provided by places of public accommodation be equally accessible to people with disabilities.

*See* Letter from Assistant Attorney General Stephen E. Boyd, U.S. Department of Justice, to Congressman Ted Budd, U.S. House of Representatives (Sept. 25, 2018) (available at

https://images.cutimes.com/contrib/content/uploads/documents/413/152136/adaletter.pdf)   (last accessed Mar. 13, 2019).

2.      More recently, the United States Court of Appeals for the Ninth Circuit confirmed the ADA applies to websites and mobile applications, equally. *See Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019).

3.      Matthew Kolesar suffers retinitis pigmentosa, a genetic disorder that left him totally blind when he was just twenty years old. Today, he uses screen reader technology, including VoiceOver with his iPhone 7, JAWS, and NVDA to navigate the Internet.

4.      Screen reader "software translates the visual internet into an auditory equivalent. At a rapid pace, the software reads the content of a webpage to the user." *Andrews v. Blick Art Materials, LLC*, 17-CV-767, 2017 WL 6542466, at *6 (E.D.N.Y. Dec. 21, 2017) (J. Weinstein).

> The screen reading software uses auditory cues to allow a visually impaired user to effectively use websites. For example, when using the visual internet, a seeing user learns that a link may be "clicked," which will bring her to another webpage, through visual cues, such as a change in the color of the text (often text is turned from black to blue). When the sighted user's cursor hovers over the link, it changes from an arrow symbol to a hand.
>
> The screen reading software uses auditory—rather than visual—cues to relay this same information. When a sight impaired individual reaches a link that may be "clicked on," the software reads the link to the user, and after reading the text of the link says the word "clickable."…Through a series of auditory cues read aloud by the screen reader, the visually impaired user can navigate a website by listening and responding with her keyboard.

*Id*. at *6-7*. *See* American Federation for the Blind, *Screen Readers*, *available at* http://www.afb.org/prodBrowseCatResults.aspx?CatID=49 (last accessed Mar. 13, 2019) (discussing screen readers and how they work).

5.      Defendant is a retailer that sells subscriptions of clothing and accessories for men and women. *See* Frank and Oak, Facebook About Page, *available at*

https://www.facebook.com/pg/frankandoak/about/?ref=page_internal (last accessed Mar. 13, 2019).

6.      Consumers may research and purchase Defendant's products and access other brand-related content and services at www.frankandoak.com and with the mobile applications Defendant makes available for iOS and Android-based mobile devices (collectively, "Website and Apps"), which Website and Apps Defendant owns, operates, and controls.

7.      Defendant is responsible for the policies, practices, and procedures concerning the Website and Apps' development and maintenance.

8.      Unfortunately, Defendant denies approximately 8.1 million Americans who have difficulty seeing access to its Website and Apps' goods, content, and services because the Website and Apps are largely incompatible with the screen reader programs these Americans use to navigate an increasingly ecommerce world. *See* Press Release, United States Census Bureau, Nearly 1 in 5 People Have a Disability in the U.S., Census Bureau Reports *Report Released to Coincide with 22nd Anniversary of the ADA* (Jul. 25, 2012), *available at* https://www.census.gov/newsroom/releases/archives/miscellaneous/cb12-134.html (last accessed Mar. 12, 2019) ("About 8.1 million people had difficulty seeing, including 2.0 million who were blind or unable to see.").

9.      Plaintiff brings this civil rights action against Defendant to enforce Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* ("Title III"), which requires, among other things, that a public accommodation (1) not deny persons with disabilities the benefits of its services, facilities, privileges and advantages; (2) provide such persons with benefits that are equal to those provided to nondisabled persons; (3) provide auxiliary aids and services—including electronic services for use with a computer screen reading program—where necessary to ensure effective communication with individuals with a visual disability, and to ensure that such persons

3

are not excluded, denied services, segregated or otherwise treated differently than sighted individuals; and (4) utilize administrative methods, practices, and policies that provide persons with disabilities equal access to online content.

10.     By failing to make its Website and Apps available in a manner compatible with computer screen reader programs, Defendant, a public accommodation subject to Title III, deprives individuals who are partially sighted, visually impaired, or totally blind the benefits of its online goods, content, and services—all benefits it affords nondisabled individuals—thereby increasing the sense of isolation and stigma among these Americans that Title III was meant to redress.

11.     Because Defendant's Website and Apps are not and have never been accessible, and because upon information and belief Defendant does not have, and has never had, an adequate corporate policy that is reasonably calculated to cause its Website and Apps to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring that:

   a)   Defendant retain a qualified consultant acceptable to Plaintiff ("Approved Accessibility Consultant") who shall assist it in improving the accessibility of its Website and Apps, including all third party content and plug-ins, so the goods and services on the Website and Apps may be equally accessed and enjoyed by individuals with vision related disabilities;

   b)   Defendant work with the Approved Accessibility Consultant to ensure that all employees involved in website and app development be given accessibility training on a biennial basis, including onsite training to create accessible content at the design and development stages;

   c)   Defendant work with the Approved Accessibility Consultant to perform an automated accessibility audit on at least a quarterly basis to evaluate whether Defendant's Website and Apps may be equally accessed and enjoyed by individuals with vision related disabilities on an ongoing basis;

   d)   Defendant work with the Approved Accessibility Consultant to perform end-user accessibility/usability testing on at least a quarterly basis with said testing to be performed by humans who are blind or have low vision, or who have training and experience in the manner in which persons who are blind use a screen reader to

navigate, browse, and conduct business on websites and apps, in addition to the testing, if applicable, that is performed using semi-automated tools;

e) Defendant incorporate all of the Approved Accessibility Consultant's recommendations within sixty (60) days of receiving the recommendations;

f) Defendant work with the Approved Accessibility Consultant to create an Accessibility Policy that will be posted on its Website and Apps, along with an e-mail address, instant messenger, and toll free phone number to report accessibility-related problems;

g) Defendant directly link from the footer on each page of the Website and Apps, a statement that indicates that Defendant is making efforts to maintain and increase the accessibility of its Website and Apps to ensure that persons with disabilities have full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of the Defendant through the Website and Apps;

h) Defendant accompany the public policy statement with an accessible means of submitting accessibility questions and problems, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Accessibility Policy;

i) Defendant provide a notice, prominently and directly linked from the footer on each page of the Website and Apps, soliciting feedback from visitors to the Website and Apps on how the accessibility of the Website and Apps can be improved. The link shall provide a method to provide feedback, including an accessible form to submit feedback or an email address to contact representatives knowledgeable about the Accessibility Policy;

j) Defendant provide a copy of the Accessibility Policy to all web and app content personnel, contractors responsible for web content, and Client Service Operations call center agents ("CSO Personnel") for the Website and Apps;

k) Defendant train no fewer than three of its CSO Personnel to automatically escalate calls from users with disabilities who encounter difficulties using the Website and Apps. Defendant shall have trained no fewer than 3 of its CSO personnel to timely assist such users with disabilities within CSO published hours of operation. Defendant shall establish procedures for promptly directing requests for assistance to such personnel including notifying the public that customer assistance is available to users with disabilities and describing the process to obtain that assistance;

l) Defendant modify existing bug fix policies, practices, and procedures to include the elimination of bugs that cause the Website and Apps to be inaccessible to users of screen reader technology;

m) Plaintiff, his counsel, and its experts monitor the Website and Apps for up to two (2) years after the Approved Accessibility Consultant validates the Website and

Apps are free of accessibility errors/violations to ensure Defendant has adopted and implemented adequate accessibility policies. To this end, Plaintiff, through his counsel and its experts, shall be entitled to consult with the Approved Accessibility Consultant at their discretion, and to review any written material, including but not limited to any recommendations the Approved Accessibility Consultant provides Defendant.

12. Electronic information technology has features and content that are modified on a daily, and in some instances an hourly, basis, and a one time "fix" to an inaccessible website or mobile application will not cause the website or mobile application to remain accessible without a corresponding change in corporate policies related to those electronic information technologies. To evaluate whether an inaccessible website or mobile application has been rendered accessible, and whether corporate policies related to electronic information technologies have been changed in a meaningful manner that will cause the website or mobile application to remain accessible, the website and mobile application must be reviewed on a periodic basis using both automated accessibility screening tools and end user testing by disabled individuals.

## JURISDICTION AND VENUE

13. The claims alleged arise under Title III such that this Court's jurisdiction is invoked pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 12188.

14. Defendant attempts to, and indeed does so, participate in the Commonwealth's economic life by clearly performing business over the Internet. Through its Website and Apps, Defendant enters into contracts for the sale of its products with residents of Pennsylvania. These electronic sales contracts involve, and indeed require, Defendant's knowing and repeated transmission of computer files over the Internet. *See Gniewkowski v. Lettuce Entertain You*, Order, ECF No. 123 (W.D. Pa Apr. 25, 2017) *clarified by* Order of Court, ECF No. 169 (W.D. Pa. June 22, 2017) (Judge Schwab) (exercising personal jurisdiction over forum plaintiff's website accessibility claims against out-of-forum website operator); *see also Access Now Inc. v. Otter*

*Products, LLC*, 280 F.Supp.3d 287 (D. Mass. Dec. 4, 2017) (same); *Access Now, Inc. v. Sportswear, Inc.*, 298 F.Supp.3d 296 (D. Mass. 2018) (same).

15.     As described in additional detail below, Plaintiff was injured when he attempted to access Defendant's Website and Apps from his home but encountered barriers that denied his full and equal access to Defendant's online goods, content, and services.

16.     Venue in this District is proper under 28 U.S.C. § 1391(b)(2) because this is the judicial district in which a substantial part of the acts and omissions giving rise to Plaintiff's claims occurred.

## PARTIES

17.     Plaintiff is and, at all times relevant hereto, has been a resident of this District. Plaintiff is and, at all times relevant hereto, has been legally blind and is therefore a member of a protected class under the ADA, 42 U.S.C. § 12102(2) and the regulations implementing the ADA set forth at 28 CFR §§ 36.101 *et seq*.

18.     Defendant is a Delaware corporation with its principle place of business at 160 St-Viateur East, Suite 613, Montreal, QC H2T 1A8, Canada.

## FACTS APPLICABLE TO ALL CLAIMS

19.     While the increasing pervasiveness of digital information presents an unprecedented opportunity to increase access to goods, content, and services for people with perceptual or motor disabilities, website and mobile application developers often implement digital technologies without regard to whether those technologies can be accessed by individuals with disabilities. This is notwithstanding the fact that accessible technology is both readily available and cost effective.

**DEFENDANT'S ONLINE CONTENT**

20.    Defendant's Website and Apps allow consumers to research and purchase Defendant's products from the comfort and convenience of their own homes, and arrange for home delivery.

21.    Defendant is responsible for the policies, practices, and procedures concerning the Website and Apps' development and maintenance.

**HARM TO PLAINTIFF**

22.    Plaintiff attempted to access the Website and Apps from his home in this District. Unfortunately, because of Defendant's failure to build its Website and Apps in a manner that is compatible with screen reader programs, Plaintiff is unable to understand, and thus is denied the benefit of, much of the content and services he wishes to access on the Website and Apps.

23.    Plaintiff attempted to access the Website and Apps using VoiceOver with iOS.

24.    VoiceOver is "a full-featured screen reader built into macOS that speaks the text in documents and windows, and describes aloud what appears on your screen…With VoiceOver, you control your Mac primarily with a keyboard, refreshable braille display, or trackpad. You use the VoiceOver cursor—which appears as a dark rectangular outline—to move around the screen, select buttons and other controls, and to read and edit text." *See* Apple, VoiceOver Getting Started Guide, *available at* https://help.apple.com/voiceover/info/guide/10.12/#/vo2681 (last accessed Mar. 12, 2018).



*The VoiceOver cursor—a dark rectangular outline—focused on the word "Accessibility" on screen.*

The italicized caption immediately above matches the alternative text that Apple provides in its VoiceOver Getting Started Guide. It illustrates the type of sufficiently descriptive alternative text that screen reader users require to fully and equally access Defendant's Website and Apps.



25.     Unfortunately, as a result of visiting Defendant's Website and Apps from this District, and from investigations performed on his behalf, Plaintiff found Defendant's Website and Apps to be unusable due to various barriers that deny him full and equal access to Defendant's online content and services. For example:

a.     The Website and Apps do not provide a text equivalent for non-text elements. Providing text alternatives allows the information to be rendered in a variety of ways by a variety of users. A person who cannot see a picture, logo, or icon can have a text alternative read aloud using synthesized speech. For example, the Website and Apps use image files to convey visually the products available for purchase. Unfortunately, Defendant's corporate accessibility policies fail to ensure these product images include alternative text to describe available products in sufficient detail so that a screen reader user, like Plaintiff, can determine what these images represent. To this end, Defendant's Website includes an image of a white tee shirt available for purchase. Unfortunately, the alternative text that



accompanies this tee shirt provides: "one one two two seven seven zero one seven one two three four five one jpeg image main landmark." This alternative text is meaningless and makes it more likely that Plaintiff will abandon the purchase process compared to consumers who are not partially sighted, visually impaired, or totally blind.

b.     The Website and Apps use visual cues to convey content and other information to sighted users. Unfortunately, screen readers cannot interpret these cues and communicate the information they represent to individuals with visual disabilities. For example, consumers who

 

perceive content visually will notice that many products available for purchase on Defendant's Website and Apps include two prices. One price—a higher price—appears in strikethrough font. The other—a lower price—does not. These users will likely infer that the price appearing in strikethrough font is the "old" or "original" price, while the price appearing in regular font is the "new" or "sale" price. Unfortunately, Plaintiff's screen reader cannot identify the meanings of these two fonts so that he can make an informed decision. Instead, Plaintiff hears two prices for the same product, and cannot determine with confidence what they signify, like different quantities, colors, sizes, or in this case, sales. This uncertainty prevents Plaintiff from making

informed purchasing decisions, and increases the odds he will abandon the purchase process without making a selection at all.

        c.    The Website and Apps use color as the only means of conveying information, indicating an action, prompting a response, or distinguishing a visual element. Providing information conveyed with color through another means is necessary to ensure that users who cannot see color

 

can still perceive this information. For example, Defendant's Website and Apps allow consumers to select products in their preferred size. Sizes in stock appear in black font. Sizes that are unavailable appear in gray font. Unfortunately, Defendant fails to include alternative text to identify the availability of each size in a non-visual means. As a result, Plaintiff cannot select a size for the products he wishes to purchase independently, making it more likely that he abandons the purchase process as a result of this frustration.



d.      The Website and Apps prevent screen reader users who navigate sequentially through content from accessing primary content directly. For example, upon visiting Defendant's Website, consumers who perceive content visually will recognize a floating icon in the bottom right corner with an image of a chat bubble. These consumers will likely infer that by clicking this icon, Defendant will redirect them to its customer service. Unfortunately, because Defendant's accessibility policies fail to ensure the Website is compatible with screen reader auxiliary aids, Plaintiff cannot activate this feature by tabbing. As a result, Defendant's policies deny Plaintiff the same opportunity to get help with his online shopping experience that Defendant offers consumers who do not rely on screen reader technology.

e.      Links and buttons on the Website and Apps do not describe their purpose. As a result, blind users cannot determine whether they want to follow a particular link or button, making navigation an exercise of trial and error. For example, consumers who perceive content visually will




likely recognize the Shopping Bag icons throughout Defendant's App, and understand that by clicking them, Defendant will redirect them to Defendant's online checkout. Unfortunately, these icons are not labeled with sufficiently descriptive alternative text. As a result, when Plaintiff hovers over the Shopping Bag icon on the Website, his screen reader reads "button end navigation end banner." When he hovers over the icon in the Apps, it reads "button." Because this alternative text is meaningless, Plaintiff is less likely than other consumers to complete a purchase successfully.

26.     These barriers, and others, deny Plaintiff full and equal access to all of the services the Website and Apps offer, and now deter him from attempting to use the Website and Apps. Still, Plaintiff would like to, and intends to, attempt to access the Website and Apps in the future to research the products and services the Website and Apps offer, or to test the Website and Apps for compliance with the ADA.

27.     If the Website and Apps were accessible, *i.e.* if Defendant removed the access barriers described above, Plaintiff could independently research and purchase Defendant's products and access its other online content and services.

28.     Though Defendant may have centralized policies regarding the maintenance and operation of its Website and Apps, Defendant has never had a plan or policy that is reasonably calculated to make its Website and Apps fully accessible to, and independently usable by, individuals with vision related disabilities. As a result, the complained of access barriers are permanent in nature and likely to persist.

29.     The law requires that Defendant reasonably accommodate Plaintiff's disabilities by removing these existing access barriers. Removal of the barriers identified above is readily achievable and may be carried out without much difficulty or expense.

30.     Plaintiff has been, and in the absence of an injunction will continue to be, injured by Defendant's failure to provide its online content and services in a manner that is compatible with screen reader technology.

**DEFENDANT'S KNOWLEDGE OF ONLINE ACCESSIBILITY REQUIREMENTS**

31.     Defendant has long known that screen reader technology is necessary for individuals with visual disabilities to access its online content and services, and that it is legally responsible for providing the same in a manner that is compatible with these auxiliary aids.

32.     Indeed, the "Department [of Justice] first articulated its interpretation that the ADA applies to public accommodations' websites over 20 years ago." As described above, on September 25, 2018, Assistant Attorney General Stephen E. Boyd confirmed nothing about the ADA, nor the Department's enforcement of it, has changed this interpretation.

33.     More recently, the United States Court of Appeals for the Ninth Circuit confirmed the ADA applies to websites and mobile applications, equally. *See Robles v. Domino's Pizza, LLC, 913 F.3d 898 (9th Cir. 2019)*.

**THE PARTIES HAVE NO ADMINISTRATIVE REMEDIES TO PURSUE**

34.     There is no DOJ administrative proceeding that could provide Plaintiff with Title III injunctive relief.

35.     While DOJ has rulemaking authority and can bring enforcement actions in court, Congress has not authorized it to provide an adjudicative administrative process to provide Plaintiff with relief.

36.     Plaintiff alleges violations of existing and longstanding statutory and regulatory requirements to provide auxiliary aids or services necessary to ensure effective communication, and courts routinely decide these types of effective communication matters.

37.     Resolution of Plaintiff's claims does not require the Court to unravel intricate, technical facts, but rather involves consideration of facts within the conventional competence of the courts, *e.g.* (a) whether Defendant offers content and services on its Website and Apps, and (b) whether Plaintiff can access the content and services.

## SUBSTANTIVE VIOLATION

### Title III of the ADA, 42 U.S.C. § 12181 *et seq*.

38.     The assertions contained in the previous paragraphs are incorporated by reference.

39.     Defendant's Website and Apps are a place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. § 12181(7). *See Suchenko v. ECCO USA, Inc.*, 2018 WL 3933514, *3 (W.D. Pa. Aug. 16, 2018)* ("Simply put, Defendant in the instant case, like other corporate defendants in *Gniewkowski* and *Suchenko*, purportedly owns, operates, and/or controls the property upon which the alleged discrimination has taken place—i.e., its website. Therefore, Plaintiff in this case has a nexus to the place of public accommodation and thus may claim the protections of Title III."); *see also Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019).

40.     In the broadest terms, the ADA prohibits discrimination on the basis of a disability in the full and equal enjoyment of goods and services of any place of public accommodation. 42 U.S.C. § 12182(a). Thus, to the extent Defendant does not provide Plaintiff with full and equal access to its Website and Apps, it has violated the ADA.

41.     In more specific terms, Title III of the ADA imposes statutory and regulatory requirements to ensure persons with disabilities are not excluded, denied services, segregated or otherwise treated differently than other individuals as a result of the absence of auxiliary aids and services. 42 U.S.C. § 12182(b)(2)(A); 28 C.F.R. §§ 36.303(a), (c). Under these provisions, public accommodations must furnish appropriate auxiliary aids and services that comply with their effective communication obligations. *Id.*

42.     Auxiliary aids and services are necessary when their absence effectively excludes an individual from participating in or benefiting from a service, or fails to provide a like experience to the disabled person.

43.     Auxiliary aids and services include, but are not limited to, audio recordings, screen reader software, magnification software, optical readers, secondary auditory programs, large print materials, accessible electronic and information technology, other effective methods of making visually delivered materials available to individuals who are blind or have low vision, and other similar services and actions. 28 C.F.R. §§ 36.303(b)(2), (4).

44.     In order to be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability. 28 C.F.R. §§ 36.303(c)(1)(ii). To this end, the Ninth Circuit has explained, "assistive technology is not frozen in time:   as technology advances, [ ] accommodations should advance as well." *Enyart v. Nat'l Conference of Bar Examiners, Inc.*, 630 F.3d 1153, 1163 (9th Cir. 2011).

45.     By failing to provide its Website and Apps' content and services in a manner that is compatible with auxiliary aids, Defendant has engaged, directly, or through contractual, licensing, or other arrangements, in illegal disability discrimination, as defined by Title III, including without limitation:

        (a)     denying individuals with visual disabilities opportunities to participate in and benefit from the goods, content, and services available on its Website and Apps;

        (b)     affording individuals with visual disabilities access to its Website and Apps that is not equal to, or effective as, that afforded others;

16

(c)     utilizing methods of administration that (i) have the effect of discriminating on the basis of disability; or (ii) perpetuate the discrimination of others who are subject to common administrative control;

(d)     denying individuals with visual disabilities effective communication, thereby excluding or otherwise treating them differently than others; and/or

(e)     failing to make reasonable modifications in policies, practices, or procedures where necessary to afford its services, privileges, advantages, or accommodations to individuals with visual disabilities.

46.     Defendant has violated Title III by, without limitation, failing to make its Website and Apps' services accessible by screen reader programs, thereby denying individuals with visual disabilities the benefits of the Website and Apps, providing them with benefits that are not equal to those it provides others, and denying them effective communication.

47.     Defendant has further violated Title III by, without limitation, utilizing administrative methods, practices, and policies that allow its Website and Apps to be made available without consideration of consumers who can only access the company's online goods, content, and services with screen reader programs.

48.     Making its online goods, content, and services compatible with screen readers does not change the content of Defendant's Website and Apps nor result in making the Website and Apps different, but enables individuals with visual disabilities to access the Website and Apps Defendant already provides.

49.     Defendant's ongoing violations of Title III have caused, and in the absence of an injunction will continue to cause, harm to Plaintiff and other individuals with visual disabilities.

50.     Plaintiff's claims are warranted by existing law or by non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law.

51.     Pursuant to 42 U.S.C. § 12188 and the remedies, procedures and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for:

(A)     A Declaratory Judgment that at the commencement of this action Defendant was in violation of the specific requirements of Title III of the ADA described above, and the relevant implementing regulations of the ADA, in that Defendant took no action that was reasonably calculated to ensure that its Website and Apps are fully accessible to, and independently usable by, individuals with visual disabilities;

(B)     A permanent injunction pursuant to 42 U.S.C. § 12188(a)(2) and 28 CFR § 36.504(a) which directs Defendant to take all steps necessary to bring its Website an Apps into full compliance with the requirements set forth in the ADA, and its implementing regulations, so that its Website and Apps are fully accessible to, and independently usable by, blind individuals, and which further directs that the Court shall retain jurisdiction for a period to be determined to ensure that Defendant has adopted and is following an institutional policy that will in fact cause it to remain fully in compliance with the law—the specific injunctive relief requested by Plaintiff is described more fully in paragraph 11 above.

(C)     Payment of actual, statutory, and other damages, as the Court deems proper;

(D)     Payment of costs of suit;

(E)     Payment of reasonable attorneys' fees, pursuant to 42 U.S.C. § 12205 and 28 CFR § 36.505, including costs of monitoring Defendant's compliance with the judgment (*see Access*

*Now, Inc. v. Lax World, LLC*, No. 1:17-cv-10976-DJC (D. Mass. Apr. 17, 2018) (ECF 11)

("Plaintiffs, as the prevailing party, may file a fee petition before the Court surrenders jurisdiction.

Pursuant to *Pennsylvania v. Delaware Valley Citizens' Council for Clean Air*, 478 U.S. 546, 559

(1986), *supplemented*, 483 U.S. 711 (1987), and *Garrity v. Sununu*, 752 F.2d 727, 738-39 (1st Cir.

1984), the fee petition may include costs to monitor Defendant's compliance with the permanent

injunction."); *see also Gniewkowski v. Lettuce Entertain You Enterprises, Inc.*, Case No. 2:16-cv-

01898-AJS (W.D. Pa. Jan. 11, 2018) (ECF 191) (same);

     (F)     Whatever other relief the Court deems just, equitable and appropriate; and

     (G)     An Order retaining jurisdiction over this case until Defendant has complied with

the Court's Orders.

     Dated: March 13, 2019          Respectfully Submitted,

                                */s/ R. Bruce Carlson*
                                R. Bruce Carlson
                                bcarlson@carlsonlynch.com
                                Kevin W. Tucker
                                ktucker@carlsonlynch.com
                                **CARLSON LYNCH, LLP**
                                1133 Penn Avenue, 5th Floor
                                Pittsburgh, PA 15222
                                Phone: (412) 322.9243

                                *Counsel for Plaintiff*